# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**DUSTIN JAMES ORTIZ,**<br>Defendant. | No. 4:21-cr-00149<br><br>**Defendant Ortiz's Sentencing Memorandum** |

**COMES NOW,** the Defendant, Dustin Ortiz, by and through undersigned counsel, and hereby presents the following memorandum to the Court in anticipation of sentencing in this matter, which is currently scheduled for June 28, 2022 at 10:00 a.m.:

### I. Introduction

Dustin Ortiz has been in federal custody since December 20, 2021. He has not seen his children, C.O. and A.O, since August of 2020, when a no-contact order was placed between him and the children's mother, S.W. (See ECF No. 67, ¶ 64 hereinafter "PSIR"). Mr. Ortiz's criminal actions, for which he has accepted responsibility, were motivated by genuine concern for the welfare of those children, who were at times in the care of M.S., the victim in this case. Knowing of M.S.'s mental and emotional health challenges, he worried she was not an appropriate childcare source. Having tried on multiple occasions to share his concerns with S.W. without success, PSIR ¶ 21, and unable to identify another way to convince S.W. of the legitimacy of his concerns, he contacted Joann Wilkerson, a relative and employee of the Veteran Affairs Administration,

and worked with her to obtain HIPAA protected healthcare information. (PSIR. ¶ 23). The sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing is 12-months and one day of imprisonment to be satisfied by a 6-month term of incarceration and a 6-month term of community confinement supervised release.

## II. Factual Background

Sometime in late 2020 or early 2021, Dustin Ortiz contacted his cousin Joann Wilkerson, an employee at the Veteran Affairs Medical Center (VAMC) in Des Moines. (PSIR ¶ 20, 21). He spoke with her about concerns he had relative to M.S.'s ability to safely care for C.O and A.O., and expressed a desire to conclusively demonstrate the validity of his concerns to S.W. (Id. at ¶ 22). After a number of requests, Wilkerson printed and delivered 4 pages of M.S's HIPAA protected healthcare records to Ortiz on February 22, 2021. (Id. at ¶ 23). Mr. Ortiz took "screenshots" of the records that same day and forwarded them to S.W. (Id. at ¶ 33). He then promptly destroyed them. (Id. ¶ at 17). He did not disclose the information to any other person. (Id.)

## III. Guideline Range Calculation

### A. USSG § 3A1.1(b)(1) "Vulnerable Victim" Enhancement Is Inapplicable

On May 4, 2022, the government filed an objection to the PSIR, contending Mr. Ortiz's base offense level (BOL) should be enhanced two levels by application of USSG § 3A1.1(b)(1) (the "vulnerable victim enhancement)". ECF. No. 69, ¶ 1. The government's position misrepresents the purpose of this enhancement and its objection should be overruled.

### i. *Applicable Law*

The Sentencing Guidelines provide for a two-level enhancement to a defendant's BOL if "the defendant knew or should have known that [the] victim of the offense was a vulnerable victim […]" USSG § 3A1.1(b)(1). The Guidelines also provide important information concerning the application of the enhancement:

> A vulnerable victim is:
>
> a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under 1B1.3 (Relevant Conduct) and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct
>
> USSG § 3A1.1, application note 2.

Eighth Circuit jurisprudence demands a fact-based explanation of why some characteristic of the victim made them "unusually vulnerable" to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability. U.S v. Anderson, 349 F.3d 568, 572 (8th Cir. 2003). The Government must prove by a preponderance of the evidence the predicate facts it believes support the enhancement. U.S. v. Hernandez-Orozco, 151 F.3d 866, 870 (8th Cir. 1998).

### ii. *Analysis*

Generally speaking, courts follow one of two distinct approaches to determine whether the vulnerable victim enhancement should apply to a particular case. Jay Dykman, Brightening the Line: Properly Identifying a Vulnerable Victim for Purposes of Section 3A1.1 of the Federal Sentencing

Guidelines, 98 Colum. L. Rev., Vol 8, 1960 (1998). In one approach, courts base their analysis on a comparison of the victim to a more hypothetically robust victim, which tends to widely expand the scope of the provision. Id.  In the other approach, courts follow the examples illustrated in the Guidelines' commentary, thereby restricting its application to cases in which the defendant's conduct truly evinces greater depravity by preying on persons in need of greater societal protection. Id.  The record in this case makes clear the Government's position relative to the enhancement relies on the first approach; that is, the Government asserts the enhancement should apply because of how Mr. Ortiz's actions have affected M.S. since the criminal conduct took place.  However, the second, more conservative approach is most consistent with the express purpose of the enhancement, which is to punish defendants for preying on people whose characteristics make them more likely to be victims of a particular crime.  The conservative approach should be followed here.

### 1. *Victim Suffering Post-conduct is not a Measure of Vulnerability*

The vulnerable victim enhancement is not designed to take into account the suffering of a particular victim, the impact of the defendant's conduct on the victim, or the victim's perspective, as each of these factors are specifically provided for in the sentencing departures explained and authorized in USSG § 5K2.2 (Physical Injury (Policy Statement)) and § 5K2.3 (Extreme Psychological Injury (Policy Statement). Id. at 1969. Rather, the enhancement is only meant to "identify particularly vulnerable victims and to inform the court about the nature of the defendant by focusing solely on the criminal conduct at issue." John

Garry, "Why Me?": Application and Misapplication of § 3A1.1, The Vulnerable Victim Enhancement of the Federal Sentencing Guidelines, 79 Cornell L. Rev. 143, 154 (1993).

The enhancement's own application notes clearly demonstrate the fact that victim suffering post-criminal conduct is not meant for consideration:

> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank

USSG § 3A1.1, application note 2.

Any defendant would know that a cancer patient would be "particularly susceptible" or "unusually vulnerable" to a fraud involving the promise of a cure for their disease. Any defendant would know that a handicapped individual is "particularly susceptible" or "unusually vulnerable" to a robbery. However, those characteristics are not tied to the experiences of the victim after the criminal act, but to the characteristics of the victim that led to the act being perpetrated against them, and make the act itself more egregious. The government's focus on M.S's after-conduct difficulties is therefore not consistent with the plain reading of the enhancement, its application notes, or 8th Circuit jurisprudence applying the same. In U.S v. Stover, 93 F.3d 1379 (8th Cir. 1996), directors of an adoption agency were convicted of defrauding its prospective-parent clients. After reviewing the extensive victim damage statements concerning the

emotional pain suffered by those who were desperate to adopt children, the district court ruled that the vulnerable victim enhancement should apply. Id. at 1382.  On appeal, the 8th circuit reversed, finding that neither a strong desire to adopt children nor the victims' infertility made them particularly susceptible to the defendant's fraudulent conduct.  Id. at 1387-88.   It stated, "Without intending to discount the pain and disappointment suffered by the defendants' victims, we hold that the district court's vulnerable victim finding was clearly erroneous. [...] In other words, the government did not demonstrate that defendants' actions in some way *exploited or took advantage* of the victims' infertility [...].   Therefore, we hold that, under the law applicable to the present case, the vulnerable victim enhancement was not justified." Id. (emphasis added).

Thus, the proper focus is whether M.S. was any more vulnerable to the disclosure of her healthcare information than any other person receiving treatment from the Department of Veteran's Affairs, and whether that vulnerability was exploited by Mr. Ortiz to accomplish his design.  Through that lens, the inapplicability of the vulnerable victim enhancement becomes clear, because the government has failed to produce any evidence to support such a contention. The vulnerable victim enhancement is therefore not applicable here, and the government's objection in this regard should be overruled.

### B. *The USSG § 3B1.1(c) Role Enhancement Does Not Apply*

Federal Sentencing Guidelines allow for a defendant's BOL to be increased by two levels "if the Defendant was an organizer, leader, manager, or supervisor

in any criminal activity [involving less than five participants]" USSG § 3B1.1(c). After a presumably careful review of the government's offense conduct statement, the PSR author declined to opine such an increase was applicable here. The government objects. ECF. No. 69, ¶ 2. As is the case with the "vulnerable victim enhancement", the government's position is inconsistent with the plain language of the guidelines, and its objection should be overruled.

### i. Applicable Law

The Guidelines' commentary relative to this enhancement is instructive:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.
>
> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. *This adjustment does not apply to a defendant who merely suggests committing the offense.*

USSG § 3B1.1, application notes 2 & 4 (emphasis added).

### ii. Analysis

The factors included in the commentary to the Guidelines offer important guideposts for the court's analysis. Considering each one in turn leads inextricably to the conclusion the role enhancement is not appropriate here:

### 1. *Exercise of Decision-making Authority*

There is no evidence Mr. Ortiz enjoyed decision-making authority over Ms. Wilkerson. Ms. Wilkerson was an autonomous actor who chose to acquiesce to Mr. Ortiz requests for M.S's medical records. He had no ability to control her movements at work, her whereabouts outside of work, or when or how the records would be produced. Similarly, there is no indication Mr. Ortiz directed the amount or scope of the disclosure.

### 2. *The Nature of Participation in the Commission of the Offense*

As it relates to the application of the role enhancement, Mr. Ortiz participated in this offense by asking Ms. Wilkerson for records he had no way of accessing without her help. He did not threaten Ms. Wilkerson. He did not surveil her work activities to make sure she was accomplishing his design. He did ask, maybe even on more than one occasion, for Ms. Wilkerson to provide him with records that would tend to bolster his position that M.S was not an appropriate choice for childcare. But merely asking Ms. Wilkerson to access the records is akin to making a suggestion that the offense be committed, which behavior is specifically not considered as worthy of a role enhancement.

### 3. *The Recruitment of Accomplices*

While it is true Mr. Ortiz reached out to Ms. Wilkerson to request M.S.'s protected healthcare information, that action cannot fairly be characterized as recruiting an accomplice. Ordinarily, an accomplice is a willing participant in a crime, not someone who, as Ms. Wilkerson claims, finally and reluctantly succumbed to Mr. Ortiz's repeated requests for M.S.'s information.

According to the government's logic, any person who obtains HIPAA protected healthcare information who is not already privy to such information by employment or another circumstance is worthy of a role enhancement under the guidelines because they would need to request the records from someone so privileged.  If everyone in Mr. Ortiz's position is subject to the enhancement, the enhancement itself loses its retributory value because it would no longer be an "enhancement" - it would just be "business as usual".  This is at least one reason why "[the] adjustment is not meant to apply to a defendant who merely suggests committing the offense." Id.

### 4. *The Claimed Right to a Larger Share of the Fruits of the Crime*

This factor is not applicable to this case as there were not profits or spoils to be had by any participant.  The inclusion of this factor does, however, shed light on the intent of the sentencing commission relative to this enhancement. Words like "organizer", "manager", "supervisor", and "leader" as used in USSG 3B1.1(a)-(c) are all typically applied to individuals in organizations, collectives, networks, or enterprises, not to the person who makes a request, no matter how impassioned or repeated, to another individual.  It would be a very expansive view of the Guidelines that determines that such an action fits that person within the ambit of 3B1.1.

### 5. *The Degree of Participation in Planning or Organizing the Offense*

Like the factor before this, "planning" and "organizing" imply more than simply suggesting or requesting a criminal action be accomplished.  The offense was not accomplished by some elaborate design.  There was no planning involved

in its completion. A concerned father asked a relative to send him some information to which she had access. This is not unlike an individual asking a favor from a friend. The fact the favor in this case involved illegal activity does not turn Mr. Ortiz into Ms. Wilkerson's supervisor.

### 6. *The Nature and Scope of the Illegal Activity*

This was a simple, single layer, transaction between two independent parties, not a complex web of illegal activity designed to avoid law enforcement scrutiny. At any point, Ms. Wilkerson was free to block Mr. Ortiz's phone calls, unfriend him on Facebook, and never hear from him again.

### 7. *The Degree of Control and Authority Exercised Over Others*

Even if the court decides Ms. Wilkerson is an accomplice in the traditional sense of the word, there is no evidence Mr. Ortiz exercised any form of supervisory or managerial authority over her. And while the government dismisses the PSR's conclusion that "there is no information that Ortiz exercised control or managerial responsibility over Wilkerson" as an "over-simplified view" of the enhancement, PSR ¶ 37; ECF. No 79, the absence of that of information sounds the death knell for the government's argument. Over and over again, the 8th circuit has remanded for resentencing cases where evidence of supervisory or managerial responsibility was lacking. In U.S v Lalley, the district court concluded the following findings warranted the imposition of the enhancement:

> The conduct of the [defendants] was such that they formed an integral part of the conspiracy scheme by laundering [the] funds in small amounts, which were small enough to avoid the triggering of currency and action required by banks where the amount is in excess of $ 10,000 or is otherwise suspicious. Basically, Godfrey took the money to the defendant who assisted him in converting that

money to cash. And as such, was an operator and did manage the transfer of the funds and did make management decisions in that regard and the part could be said the $ 630,000 was something less than [sic] otherwise extensive operation, it represents about 25 percent of the total amount of money that was stolen from the Oglala Lakota College.

U.S. v Lalley, 257 F.3d 751, 756 (8th Cir 2001)

The 8th Circuit reversed, noting:

This finding certainly goes to the extensiveness of the operation, but it does not demonstrate that Lalley was the manager or supervisor of one or more other participants. Accordingly, the necessary factual predicate for a section 3B1.1(b) adjustment has not been established.

We explained the necessity of such a finding in United States v. McFarlane, 64 F.3d 1235, 1238-39 (8th Cir. 1995), when we described the amendment to the section 3B1.1 commentary effective November 1, 1993, which added the language that to qualify for the adjustment the defendant **must** have been the organizer, leader, manager, or supervisor of one or more other participants.

Id. (emphasis added).

The 8th Circuit also reversed the district court's imposition of the enhancement in U.S. v. Toro-Aguilera. There, the district court imposed the enhancement USSG 3B1.1(b) upon a defendant for his role in a "large [drug] distribution ring". 138 F.3d 340, 342 (8th Cir. 1998). The 8th Circuit reversed, noting that "a seller's front arrangements with his customers could very well give him an incentive to exercise considerable control over their activities[,] but "***without evidence of . . . control***, evidence of a front arrangement was by itself insufficient to demonstrate the level of control necessary" to support a § 3B1.1 enhancement. Id. at 343 (internal citations omitted) (emphasis added).

The 8th Circuit reached a similar conclusion in U.S v. Logan, where the defendant was involved in a conspiracy to deliver methamphetamine. There, the 8th Circuit said, "the only evidence at trial with respect to anything that might be construed as a managerial or supervisory role for Mr. Logan was the testimony of one witness who stated that he bought methamphetamine in one-ounce quantities from Mr. Logan "every two or three days" -- whenever he would "run out" -- for "a short while.," further noting "that that the witness stated that he stopped buying from Mr. Logan when the "product started being bad" -- when it "was cut." U.S. v. Logan, 121 F.3d 1172, 1178. The Court finally concluded that:

> The amounts of money […] that Mr. Logan can fairly be charged with sending to [his co-defendant's] does allow the inference that Mr. Logan was buying methamphetamine in quantities appropriate for distribution. Status as a distributor, however, by itself is not sufficient to justify a finding that a ***defendant is a manager or supervisor***. We therefore reverse the trial court's finding that Mr. Logan was a manager or supervisor.

Id. at 1179.

Several more cases could be discussed at length, all of them standing for the proposition that no role enhancement is appropriate where a defendant has not exercised control or managerial authority over his co-defendant. See U.S. v. Bryson, 110 F.3d 575 (8th Cir. 1997), U.S. v. Miller, 91 F.3d 1160 (8th Cir. 1996), U.S. v. Willard Makes Room for Them, 49 F.3d 410 (8th Cir. 1995), U.S. v. Rowley, 975 F.2d 1357 (8th Cir. 1992). As Mr. Ortiz exercised no authority over Ms. Wilkerson, a fact all but conceded by the government (ECF 79, page 5)

the 3B1.1(c) role enhancement is inappropriate and the government's objection should be overruled.

### IV. Section 3553(a) Factors

The district court's responsibility is not to impose a "reasonable" sentence, but a sentence that is sufficient, but not greater than necessary, to comply with the sentencing goals set forth in the § 3553(a) factors. United States v. Bravo, 624 F.3d 921, 924 (8th Cir. 2010). Justice requires not just consideration of the nature of the offense, but also the "character and propensities of the offender." Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55 (1937). The 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for…the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines…;

(5) any pertinent policy statement…issued by the Sentencing Commission…;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Considering the 18 U.S.C. § 3553(a) factors, Gall v. United States, 552 U.S. 38, 49 (2007), and all facts outlined in this brief, a sentence of 12-months imprisonment to be satisfied by a 6-month term of incarceration and a 6-month term of community confinement supervised release would be "sufficient, but not greater than necessary," see § 3553(a), to comply with the purposes of sentencing.

### A. *Nature and Circumstances of the Offense*

The Defendant does not wish to minimize the seriousness of his actions, nor the seriousness of the harm suffered by M.S., her family, and Ms. Wilkerson's family. However, the health information disclosure in this case was to a single individual who already knew the information contained in the documents. (Nov. 8, 2022 Interview with Samantha Wheeler, at 8 mins, 40 seconds). Once the disclosure was made, Mr. Ortiz destroyed the records, and no further disclosure

was made. The limited disclosure of the records and the purpose therefor support the imposition of a 12-month, part community confinement sentence.

### B. History and circumstances of Defendant

Admittedly, Mr. Ortiz's criminal history is serious and extensive with several incidents of violence. But this offense should be seen as an indication that, although a demonstration of flawed and criminal thinking, Mr. Ortiz has moved passed the violent tendencies of his past. Instead of engaging in the violent actions of which his criminal history shows him to be capable, Mr. Ortiz instead sought to prove to the mother of his children that M.S should not be trusted to care for his children in a relatively peaceful, though clearly wrong and hurtful, manner. Furthermore, Mr. Ortiz has not been disciplined while in nearly-one-year stay in the Polk County Jail. PSR ¶ 7. Finally, the court should consider Mr. Ortiz's actions in this case through the lens of a person who grew up without a father and failed to establish a close relationship with him. PSR ¶ 74. Not having had a father in his life, it is not difficult to imagine Mr. Ortiz trying to compensate for that lack by engaging in such extreme measures to protect his children. Clearly his conduct was wholly wrong. But his own difficulties with paternal connection as a child may have played a compelling role in his choices in this instance.

### C. Retribution, Deterrence, Incapacitation, and Rehabilitation

A 12 month and one-day hybrid community corrections sentence is sufficient to meet the aims of 3553a(2)(a-d). Under such a sentence, Mr. Oritz would finish his 320-day jail sentence in the Polk County Jail, and wait further

for a bed to become available at Kingdom Living. That amount of jail time is sufficient to teach Mr. Ortiz the important lesson that this kind of behavior, for whatever motive one may have, is completely inappropriate. It is also enough to keep Mr. Ortiz from further offending because the record shows Mr. Ortiz has not reached out to M.S or contacted her in anyway. While on supervised release, conditions would be imposed upon him that would incapacitate him from engaging in further criminal behavior. His rehabilitation would be encouraged with such a sentence because it would allow him to return to the sober living house, participate in AA, and progress toward sponsoring and mentoring others.

### V. *Restitution*

18 USC § 3663(B)(i)(I) authorizes the court to order restitution after considering, among other factors, "the amount of the loss sustained by each victim ***as a result of the offense***". Here, M.S. seeks $2919.76 for expenses she incurred upon moving from her apartment. Presumably, her position is that Mr. Ortiz's disclosure of her medical records made her feel so unsafe she needed to change residences and install cameras at her new home to protect herself from further offenses by Mr. Ortiz. While no one wishes to minimize the pain and suffering caused by Mr. Ortiz's actions, the government's proposed sentencing exhibits show that M.S's claimed losses cannot be attributed to Mr. Ortiz's actions, and a restitution order should not be made.

The disclosure in this case was made on or about February 23, 2021. ECF No. 2 ¶ 5. Yet M.S's first claimed expense occurred on October 1, 2021, a full 220 days after the disclosure, and nearly 3 months after he was incarcerated for

violations of the no contact order between himself and S.W. ECF No 78-2. Besides that, she is seeking restitution for late rent and the fees associated with the damage her family caused to the apartment from which she was leaving. ECF. No. 78-3. The space of time between the disclosure and M.S. move makes it difficult to understand how the move, and its associated expenses, could rationally be characterized as "a result of [Mr. Ortiz's] offense" as required by statute. The request for restitution should therefore be denied.

### *VI.     Conclusion*

By obtaining and disclosing M.S.'s medical information, Mr. Ortiz made a terrible and hurtful mistake. For the foregoing reasons, and in harmony with the PSR, the court should assign him a total offense level of 7. Based on his criminal history category of VI, the appropriate guideline range for Mr. Ortiz is 12-18 months. That guideline range falls within Zone C, which allows for a sentence of imprisonment to include a term of supervised release that substitutes community confinement for at most one half of the term of incarceration ordered. In this case, Mr. Ortiz should be sentenced to 12 months and one day of incarceration, with credit for time served, and the remainder of his sentence should be served at the Kingdom Living facility, and restitution should not be ordered.

Respectfully Submitted 23 JUN 2022,

JHD Law

By: _____
Jonah Hammer Dyer - AT0010633
309 Court Avenue, Suite 202
Des Moines, Iowa 50309
Telephone:  (515) 875-4818
Facsimile:  (515) 875-4819
Email:       jdyer@jhdlawfirm.com

Filed electronically.

Copies to entitled parties by ECF on 23 JUN 2022